## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AZORIA CAPITAL, INC.** | : |
| | : |
| | : |
| *Plaintiff,* | : |
| v. | : |
| | : |
| **JEROME H. POWELL, in his official** | : |
| **capacity as Chair of the Board of Governors of** | : |
| **the Federal Reserve System and Chair of the** | : |
| **Federal Open Market Committee; JOHN C.** | : |
| **WILLIAMS, in his official capacity as President** | : |
| **of the Federal Reserve Bank of New York and** | : |
| **Vice Chair of the Federal Open Market** | : |
| **Committee; MICHAEL S. BARR, MICHELLE** | : |
| **W. BOWMAN, SUSAN M. COLLINS, LISA D.** | : |
| **COOK, AUSTAN D. GOOLSBEE, PHILIP N.** | : |
| **JEFFERSON, ADRIANA D. KUGLER,** | : |
| **ALBERTO G. MUSALEM, JEFFREY R.** | : |
| **SCHMID, and CHRISTOPHER J. WALLER,** | : |
| **each in their official capacities as Members of** | : |
| **the Federal Open Market Committee; and the** | : |
| **FEDERAL OPEN MARKET COMMITTEE,** | : |
| | : |
| *Defendants.* | : |
| | : |

Civil Action No. _____

## PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT FOR TEMPORARY RESTRAINING ORDER, DECLARATORY JUDGMENT, AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

Plaintiff Azoria Capital, Inc. seeks declaratory and injunctive relief against Defendants Jerome H. Powell, in his official capacity as Chair of the Board of Governors of the Federal Reserve System and Chair of the Federal Open Market Committee; John C. Williams, in his official capacity as President of the Federal Reserve Bank of New York and Vice Chair of the Federal Open Market Committee; Michael S. Barr, Michelle W. Bowman, Susan M. Collins, Lisa D. Cook, Austan D. Goolsbee, Philip N. Jefferson, Adriana D. Kugler, Alberto G. Musalem,

Jeffrey R. Schmid, and Christopher J. Waller, each in their official capacities as Members of the Federal Open Market Committee; and the Federal Open Market Committee, and alleges as follows:

## SUMMARY

1.      For nearly five decades, the Federal Open Market Committee ("FOMC") has illegally conducted its deliberations in closed-door sessions and delayed the release of information, relying on its legally incorrect "Sunshine Act Policy," 12 C.F.R. § 281.1, to categorically deny the public access to information to which it is statutorily entitled. This violates the Government in the Sunshine Act ("Sunshine Act" or "Act") and the Administrative Procedure Act ("APA"), and, accordingly, the Court should preliminarily and permanently: (1) enjoin the Defendants from holding closed-door meetings without properly invoking any Sunshine Act exemption; (2) declare invalid, set aside, and enjoin Defendants from enforcing their current Sunshine Act Policy; and, (3) order Defendants to promulgate a new policy that implements the Sunshine Act in a manner that complies with the requirements of law.

## NATURE OF THE ACTION

2.      This action arises under the Government in the Sunshine Act (the "Sunshine Act" or the "Act"), 5 U.S.C. § 552b, a law enacted in the fallout of the Watergate scandal to mandate openness in federal agency deliberations and ensure public accountability and transparency in government decision-making.

3.      The Act requires multi-member federal agencies to conduct their meetings open to the public, guaranteeing Americans a right to observe how potentially life-altering policies are being deliberated by policymakers (who are often unaccountable to the public at large and the communities they regulate). The Act was further intended to ensure that sophisticated players in

heavily regulated industries and everyday Americans alike can make their voices heard about major policy decisions *before* the government makes them.

4.      The Act creates a presumption of transparency by providing that "every portion of every meeting of an agency shall be open to public observation" unless a specifically enumerated, narrow exemption applies. 5 U.S.C. § 552b(b).

5.      To invoke one of the limited statutory exceptions to the presumption of open meetings, the agency must vote to invoke the exception and–within one day–must publish the vote and a full explanation of the decision to close the meeting. *Id.* § 552b(d)(1), (3).

6.      Remarkably—for nearly five decades—the Federal Open Market Committee ("FOMC") has brazenly flouted this mandate, categorically closing **every single meeting** it has held since 1977. *See* 12 C.F.R. § 281.1. Relying on unsupported claims that the Act does not apply to the FOMC, or alternatively that a certain exemption justifies a blanket, preemptive closure of all of its meetings, the FOMC has withheld real-time access to deliberations that shape the nation's monetary policy and economic future, willfully operating as if the Sunshine Act's requirements simply do not exist, and consequently violating federal law.

7.      The FOMC's decades-long policy of blanket secrecy is unlawful. Undisputedly an "agency" or "subdivision thereof" under 5 U.S.C. § 552b(a)(1), the FOMC falls squarely within the Sunshine Act's scope, requiring it to hold meetings open to public observation, ensure deliberations are accessible for informed citizen input, and provide opportunities for Americans to voice concerns on policies before finalization.

8.      Instead, the FOMC has operated in the shadows, deliberating crucial decisions that impact the economic well-being of every American—namely the federal funds rate—without transparency, oversight, or public awareness. This degree of secrecy by a federal agency is without

precedent, as other financial agencies—including the Securities and Exchange Commission and Commodity Futures Trading Commission—follow the Sunshine Act and routinely hold meetings open to the public. As the entity setting the federal funds rate—a key driver of inflation, employment, and consumer and business borrowing—the FOMC's decisions have profound impacts throughout the entire U.S. economy and impact every U.S. citizen and business alike.

9.     Azoria Capital, Inc. ("Azoria") is one such entity. Azoria is an investment firm founded and led by James T. Fishback that manages the Azoria 500 Meritocracy ETF (ticker: SPXM), an "anti-DEI" exchange-traded fund that exclusively invests in S&P 500 companies that hire based on merit, and the forthcoming Azoria Golden Age ETF (ticker: GAGE), an exchange-traded fund that invests in a diversified portfolio of American companies, impacted by major economic shifts in developments in artificial intelligence, domestic manufacturing, and energy independence, as well as the federal funds rate.

10.     Azoria's business is highly sensitive to macroeconomic conditions—particularly interest rates, inflation expectations, and credit availability—which are directly shaped by the FOMC's monetary policy decisions. The FOMC's unlawful secrecy deprives Azoria of real-time access to these deliberations, forcing Azoria to allocate capital amid the FOMC's deliberately ambiguous signals—vague speeches, boilerplate meeting "minutes" released weeks later, and full transcripts withheld for five years. This secrecy impairs Azoria's ability to make informed investment decisions, frustrating its fiduciary duty to investors by increasing risks of misallocation and volatility, causing substantial financial harm to Azoria and its investors.

11.     The FOMC's deliberate evasion of the Sunshine Act must end. Despite the Act's clear applicability to the FOMC, Defendants have categorically closed FOMC meetings to the American public without the required case-by-case votes, individualized findings, or publicly

articulated explanations. This practice directly contravenes the Act's presumption of openness, undermining the very democratic accountability the statute was designed to protect.

12.     For Azoria, this secrecy translates to concrete economic injury: Without real-time access to FOMC deliberations about the federal funds rate, Azoria cannot fully consider and protect itself against Federal Reserve policy shifts that can create volatility and suddenly reprice assets in its SPXM or GAGE ETFs. Rate hikes that exceed market expectations generally cause stocks to go down, while rate cuts that exceed market expectations generally cause stocks to go up. FOMC deliberations would provide critical information about the FOMC members' current views, which has significant influence on the future path of interest rates (whether they will be raised or lowered in the near future) and, by extension, Azoria's ability to manage its ETFs.

13.     Azoria is also injured by the FOMC's unlawful decision to shield its discussion of pertinent economic information. The FOMC is expected to review and discuss substantial factual material concerning inflation, employment, consumer sentiment, and developments in the equities, bond, and currency markets. This information is crucial to Azoria's ability to make sound investment decisions and exercise its independent judgment concerning market conditions independent of action taken by the FOMC.

14.     The Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), overruling *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), eliminates any deference to the FOMC's self-serving interpretations of the Act, leaving no doubt that courts shall enforce the Act's plain text and deliver the transparency Azoria urgently needs to protect its operations and investors.

15.     The FOMC's upcoming July 29-30, 2025, meeting—where the FOMC will review and discuss economic data and decide whether to change interest rates[1]—could drastically alter market conditions critical to Azoria's ETF strategy. Without access to these discussions, Azoria faces immediate and irreparable harm—distorted signals leading to potential misallocation of capital, heightened volatility risks for its ETFs (SPXM and GAGE) and investors, and the frustration of Azoria's ability to fulfill its fiduciary obligations in a timely manner, along with denial of access to information that is presumed to be open under the Sunshine Act. The balance of equities favors transparency, as the public interest in observing the FOMC's discussion of economic data and deliberations concerning monetary policies affecting the entire economy far outweighs any claimed need for secrecy.

16.     Azoria accordingly brings this suit under the Sunshine Act, which empowers "any person" to sue for "declaratory judgment, injunctive relief, or other relief as may be appropriate" to bring an agency into compliance with the Act's open meeting provisions. 5 U.S.C. § 552b(h)(1).

17.     Azoria also sues under the Administrative Procedure Act, 5 U.S.C. §§ 701-706, (the "APA") to "compel agency action unlawfully withheld or unreasonably delayed" and "hold unlawful and set aside" the FOMC's secrecy policy, 12 C.F.R. § 281, "as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(1), (2)(A).

18.     Azoria seeks a declaratory judgment that the FOMC's secrecy policy, outlined in 12 C.F.R. § 281.1, is unlawful and violates the Act; a temporary restraining order enjoining the unlawful closure of the July 29-30, 2025, meeting; temporary and permanent injunctive relief to halt future categorical closures and ensure compliance with the Act's transparency requirements;

---

[1] The FOMC announced this meeting—with no substantive details—on its website at https://www.federalreserve.gov/monetarypolicy/fomccalendars.htm (accessed July 21, 2025).

and an award of reasonable attorney fees and costs authorized by the Sunshine Act to incentivize American persons and businesses to hold their government accountable for complying with the Act's crucial transparency mandate.

19.     Absent immediate judicial intervention before the FOMC's meeting scheduled for July 29-30, Azoria will suffer the ongoing and irreparable harm described herein.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331, as it arises under the Government in the Sunshine Act, 5 U.S.C. § 552b. The Sunshine Act expressly authorizes enforcement actions in the district courts of the United States for violations of its open-meeting requirements, including through declaratory judgment, injunctive relief, or other appropriate remedies. 5 U.S.C. § 552b(g), (h)(1). This Court further has subject matter jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 702.

21.     This Court has personal jurisdiction over Defendants, who are sued in their official capacities as federal officials and entities conducting official business in this District.

22.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1), as Defendants reside in and perform their official duties in the District of Columbia, where the FOMC does business, convenes, and makes the monetary policy decisions at issue; under 5 U.S.C. § 552b(h)(1) (providing that actions to enforce the Act "may be brought in the district court of the United States for the district in which the agency meeting is held or in which the agency in question has its headquarters, or in the District Court for the District of Columbia"); and under 5 U.S.C. § 703 (the Administrative Procedure Act).

## PARTIES

23.    Plaintiff Azoria is a corporation organized under the laws of the State of Delaware, with its principal place of business in Washington, D.C. Azoria is an investment management firm that manages the Azoria 500 Meritocracy ETF and the forthcoming Azoria Golden Age ETF, an actively managed investment fund investing in American companies.

24.    Defendant Jerome H. Powell is the Chair of the Board of Governors of the Federal Reserve System with a residence in Washington, D.C., and serves as the presiding officer of the FOMC, responsible for presiding over and participating in deliberations on U.S. monetary policy that affect national economic conditions. He is sued in his official capacity.

25.    Defendant John C. Williams is the President of the Federal Reserve Bank of New York and serves as the Vice Chair of the FOMC, participating in and voting on monetary policy decisions that impact national economic conditions. He is sued in his official capacity.

26.    Defendant Michael S. Barr is the Vice Chair for Supervision of the Board of Governors of the Federal Reserve System and a Member of the FOMC. He is sued in his official capacity.

27.    Defendant Michelle W. Bowman is a Member of the Board of Governors of the Federal Reserve System and a Member of the FOMC. She is sued in her official capacity.

28.    Defendant Susan M. Collins is the President of the Federal Reserve Bank of Boston and a rotating Member of the FOMC. She is sued in her official capacity.

29.    Defendant Lisa D. Cook is a Member of the Board of Governors of the Federal Reserve System and a Member of the FOMC. She is sued in her official capacity.

30.    Defendant Austan D. Goolsbee is the President of the Federal Reserve Bank of Chicago and a rotating Member of the FOMC. He is sued in his official capacity.

31.     Defendant Philip N. Jefferson is the Vice Chair of the Board of Governors of the Federal Reserve System and a Member of the FOMC. He is sued in his official capacity.

32.     Defendant Adriana D. Kugler is a Member of the Board of Governors of the Federal Reserve System and a Member of the FOMC. She is sued in her official capacity.

33.     Defendant Alberto G. Musalem is the President of the Federal Reserve Bank of St. Louis and a rotating Member of the FOMC. He is sued in his official capacity.

34.     Defendant Jeffrey R. Schmid is the President of the Federal Reserve Bank of Kansas City and a rotating Member of the FOMC. He is sued in his official capacity.

35.     Defendant Christopher J. Waller is a Member of the Board of Governors of the Federal Reserve System and a Member of the FOMC. He is sued in his official capacity.

36.     Defendant Federal Open Market Committee ("FOMC") is a statutory agency of the United States government headquartered in Washington, D.C., which is responsible for formulating and directing specific elements of U.S. monetary policy. The FOMC includes the seven members of the Board of Governors of the Federal Reserve System, and five representatives from the twelve Federal Reserve Banks throughout the United States.

### LEGAL FRAMEWORK AND FACTUAL ALLEGATIONS

*The Sunshine Act*

37.     In 1976, in response to erosion of public trust in government following the Watergate scandal, Congress enacted the Government in the Sunshine Act, Pub. L. No. 94-409, 90 Stat. 1241 (1976), codified at 5 U.S.C. § 552b, to mandate transparency in federal agency deliberations.

38.     The Act requires that "every portion of every meeting of an agency shall be open to public observation," fostering accountability and restoring faith in democratic governance. *Id.* § 552b(b).

39.     The term "agency," as defined in the Act, includes (1) any agency as defined in 5 U.S.C. § 552(f)(1) [originally cross-referenced as § 552(e) in the 1976 Sunshine Act but renumbered by the subsequent amendments], headed by a collegial body of two or more Senate-confirmed presidential appointees; and (2) any "subdivision" authorized to act on the agency's behalf. *Id.* § 552b(a)(1).

40.     The Act further defines a "meeting" as deliberations of at least the number of members required for agency action, where such discussions determine or result in official conduct. *Id.* § 552b(a)(2).

41.     The Senate Committee on Government Operations emphasized the Act's purpose, underscoring that openness is a democratic, not partisan, imperative by quoting former President Woodrow Wilson's illuminating statement on the necessity of government transparency:

> Light is the only thing that can sweeten our political atmosphere—light thrown upon every detail of administration in the departments—light blazed full upon every feature of legislation—light that can penetrate every recess or corner in which any intrigue might hide; light that can illuminate all the public acts of public men.

S. Rep. No. 94-354, at 3 (1975).

42.     The Committee made clear "that the government should conduct the public's business in public," S. Rep. No. 94-354, at 1 (1975), and explained the Act's purpose in depth:

> The bill will help increase the public's faith in the integrity of government, enable the public to better understand the decisions reached by the Government, and better acquaint the public with the process by which agency decisions are reached.

S. Rep. No. 94-354, at 1 (1975).

43.     The House Committee on Government Operations reinforced this mandate:

The purpose of the proposed legislation is to amend the Administrative Procedure Act provisions of title 5, United States Code, to provide, subject to the exceptions in the bill, that all meetings of agencies headed by a collegial body of two or more members shall be open to public observation.

H.R. Rep. No. 94 880, pt. II, at 2212 (1976).

44.     Central to the Act's operation is its presumption of openness: Every portion of a meeting must be open to public observation unless closed under one of ten specific exemptions in § 552b(c), with agencies required to minimize closures and to conduct meetings open to the public—even where an exception applies—if it is nevertheless in the public's interest to hold an open meeting 5 U.S.C. § 552b(b), (c).

45.     To close a meeting, agencies must follow rigorous procedures: "Action [to close] shall be taken only when a majority of the entire membership of the agency … votes to take such action," with each vote recorded and publicly disclosed within one day, alongside "a full written explanation of its action closing the portion together with a list of all persons expected to attend the meeting and their affiliation." *Id.* § 552b(d)(1), (3). Agencies must also provide public notice at least one week prior, detailing the "time, place, and subject matter of the meeting, whether it is to be open or closed." *Id.* § 552b(e)(1). For closed meetings, agencies must keep complete transcripts, recordings, or minutes, disclosing non-exempt segments promptly to the public, ensuring accountability even where an exemption applies. *Id.* § 552b(f).

46.     Even in closed meetings, agencies must maintain "a complete transcript or electronic recording adequate to record fully the proceedings" or detailed minutes, which must be "promptly available to the public" except for exempt portions. *Id.* § 552b(f)(1)-(2).

47.     Relevant here is exemption 9(A), which allows closure only when disclosure would "in the case of an agency which regulates currencies, securities, commodities, or financial institutions, be likely to (i) lead to significant financial speculation in currencies, securities, or

commodities, or (ii) significantly endanger the stability of any financial institution." *Id.* § 552b(c)(9)(A).

48.    An agency desiring to use one of the enumerated exemptions to close all, or even a portion of a meeting, should be met with skepticism. "The exemptions . . . are to be narrowly interpreted and the agency bears the burden of proof on any claimed exemption." *Wilkinson v. Legal Services Corp.*, 865 F. Supp. 891 (D.D.C. 1994), rev'd on other grounds, 80 F.3d 535 (D.C. Cir. 1996).

49.    Born in the wake of a political scandal that rocked the foundation of public trust in government, the Sunshine Act stands as a beacon of reform and transparency, demanding that agencies like the FOMC operate in the light of public scrutiny. Its rigorous requirements—open meetings, recorded votes, accessible records, and narrowly tailored exemptions—ensure that all Americans can hold their government accountable, restoring trust through the power of transparency.

### The Federal Open Market Committee and Its Role in U.S. Monetary Policy

50.    In the wake of financial panics that shook the early 20th-century economy, Congress endeavored to forge a bulwark of stability for the nation's monetary system. The Federal Reserve Act of 1913, Pub. L. No. 63-43, 38 Stat. 251, established the Federal Reserve System as the central banking authority designed to safeguard economic stability, regulate the money supply, and oversee the nation's financial institutions. Envisioned as the steward of America's economic framework, the Federal Reserve System wields unparalleled authority to shape the financial landscape for businesses, individuals, and markets alike.

51.    The Federal Reserve System is governed by the Board of Governors (the "Board"), a collegial body of seven members, each appointed by the President and confirmed by the Senate,

as mandated by 12 U.S.C. § 241. Headquartered in Washington, D.C., the Board oversees the Federal Reserve System's operations, including monetary policy, bank supervision, and financial regulation. Its members serve staggered 14-year terms. *Id.*.

52.     Given its structure as a collegial body headed by members appointed by the President and confirmed by the Senate, the Board is an "agency" under the Sunshine Act. 5 U.S.C. § 552b(a)(1).

53.     The Federal Reserve System also includes twelve regional Federal Reserve Banks ("FRBs"). The FRBs are "semi-autonomous institutions with private funding and independent corporate structures" chartered by Congress and often referred to as "fiscal agents" of the government. *Bloomberg L.P. v. Bd. of Governors of Fed. Rsrv. Sys.*, 649 F. Supp. 2d 262, 265 (S.D.N.Y. 2009), *aff'd sub nom. Bloomberg, L.P. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 601 F.3d 143 (2d Cir. 2010).

54.     The FOMC is composed of twelve members representing the Board and the FRBs: the seven members of the Board of Governors and five representatives from the FRBs, selected under procedures established by the Board, as provided in 12 U.S.C. § 263(a).

55.     The FOMC's core function is to direct open market operations—the purchase and sale of government securities—that shape the money supply, interest rates, and credit availability across the United States. Under 12 U.S.C. § 263(c), the FOMC sets the federal funds rate, the benchmark interest rate that influences borrowing costs for banks, businesses, and consumers. The FOMC also oversees asset purchase programs, such as quantitative easing, which inject liquidity into financial markets to stabilize or stimulate economic activity.

56.     The FOMC convenes at least eight times annually, typically in Washington, D.C., to assess economic conditions and determine monetary policy actions. These meetings involve

discussions of data, forecasts, and policy options, requiring a quorum of at least seven members to act, as set forth in 12 U.S.C. § 263(a).

57.     The FOMC's decisions are executed through the Federal Reserve Bank of New York.

58.     The Federal Reserve System and the FOMC have a profound influence on the U.S. economy. For example, by setting the federal funds rate, the FOMC directly affects mortgage rates, auto loans, and business financing, shaping the financial realities of millions. Individuals and small businesses bear the weight of the FOMC's actions.

***The FOMC's Unlawful Categorical Closures***

59.     Following the passage of the Sunshine Act in 1976, the FOMC, despite being subject to the Act's openness requirements, embarked on a path of categorical secrecy. From the Act's effective date in 1977, the FOMC has closed every monetary policy meeting to public observation, denying Americans the access to deliberations that the Sunshine Act mandates. This practice, unbroken for nearly five decades, stands in defiance of the Act's presumption that "every portion of every meeting of an agency shall be open to public observation." 5 U.S.C. § 552b(b).

60.     The FOMC's blanket closure policy began with its first post-Sunshine Act meeting in 1977 and continues under current Federal Reserve Chairman Jerome Powell, with no record of any meeting held open to the public.

61.     Unlike other financial regulators, such as the Securities and Exchange Commission or Commodity Futures Trading Commission, which comply with the Sunshine Act by holding open meetings on matters of comparable market sensitivity, the FOMC has consistently barred public access to its deliberations on interest rates, asset purchases, and economic policy.

62. The Sunshine Act imposes strict requirements for closing meetings: agencies must conduct a "separate vote of the agency members" for each meeting or portion proposed to be closed, with a "full written explanation" and public notice of the time, place, and subject matter. 5 U.S.C. § 552b(d)(1), (e)(1). Yet the FOMC has never documented such case-by-case votes or provided the mandated explanations for its closures, opting instead for a categorical policy that flouts the Act's procedural safeguards.

63. Under the Act, "the term 'agency' means any agency, as defined in section 552(e) of this title [*i.e.*, the Freedom of Information Act ("FOIA")], headed by a collegial body composed of two or more individual members, a majority of whom are appointed to such position by the President with the advice and consent of the Senate, and any subdivision thereof authorized to act on behalf of the agency." 5 U.S.C. § 552b(a)(1).

64. The FOMC justifies its secrecy policy through a policy statement, adopted by regulation at 12 C.F.R. § 281.1, asserting that it is exempt from the Sunshine Act. According to the policy statement, "the FOMC does not fall within the scope of an 'agency' or 'subdivision' as defined in the Sunshine Act and consequently is not subject to the provisions of that Act." 12 C.F.R. § 281.1. This assertion is baseless, self-serving, and legally incorrect.

65. Both the FOMC and the Board satisfy the definition of "agency" under FOIA. 5 U.S.C. § 552(f)(1) ("agency" "includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (including the Executive Office of the President), or any independent regulatory agency."). Courts have recognized this. *See, e.g.*, *A. G. Becker Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 502 F. Supp. 378, 383 (D.D.C. 1980) (recognizing the Board as

agency under the Sunshine Act); *Bloomberg L.P.*, 649 F. Supp. 2d at 266 (recognizing the FOMC as "a separate governmental agency that shares offices with the Board.").

66.     The policy statement claims exemption from the Sunshine Act on the theory that its members are not appointed "to such position" on the FOMC by the President, claiming that Board members serve ex officio and FRB representatives are selected under 12 U.S.C. § 263(a). *See* 12 C.F.R. § 281.1. This argument misreads the Sunshine Act's scope. The Act applies to agencies or subdivisions headed by a collegial body, the majority of whom are Senate-confirmed, not to individual member appointments to the subdivision itself. The FOMC's seven Board members—all presidentially appointed and Senate-confirmed—constitute a majority of its twelve-member body, satisfying the Act's definition. 5 U.S.C. § 552b(a)(1). The inclusion of FRB representatives does not alter this.

67.     Moreover, the Sunshine Act captures "any subdivision" of a covered agency that is "authorized to act on behalf of the agency." 5 U.S.C. § 552b(a)(1). Congress gave the FOMC a specific statutory mandate, providing that the FOMC "shall consider, adopt, and transmit to the several Federal Reserve banks, regulations relating to the open-market transactions of such banks." 12 U.S.C. § 263(b). Thus, even if the FOMC were not considered an "independent regulatory agency," it would still be considered a "subdivision" of the Federal Reserve System and therefore cannot escape the Act's transparency requirements.

68.     Seemingly recognizing the weakness of its argument of non-applicability, the FOMC's policy statement goes on to anticipate that even if the Sunshine Act applies to it, closure of its meetings is still justified under Exemption 9(A), which permits closure where disclosure would "be likely to lead to significant financial speculation in currencies, securities, or commodities." 12 C.F.R. § 281.1 (quoting 5 U.S.C. § 552b(c)(9)(A)). The policy statement asserts

that—based on its review of its recent agendas—"all such meetings could have been closed pursuant to the exemption dealing with financial speculation or other exemptions." *Id*. This blanket assertion cannot satisfy the standard under Exemption 9(A), which requires specific, case-by-case findings for each closure, supported by a majority vote and public explanation. 5 U.S.C. § 552b(d)(1). The FOMC's categorical reliance on Exemption 9(A) without individualized justification, deliberation, or vote violates the Act's procedural requirements. 5 U.S.C. § 552b(d)(1).

69.     Moreover, not all FOMC deliberations inherently trigger financial speculation. Discussions of general economic outlooks, procedural matters, or non-market-sensitive policies— routinely addressed in open meetings by agencies like the Securities and Exchange Commission— do not meet Exemption 9(A)'s narrow criteria. The FOMC's failure to parse its agendas for openable portions, as required by the Act's presumption of openness, renders its closure policy unlawful.

70.     The FOMC's claim that its "Record of Policy Actions," released approximately one month after meetings, satisfies the Sunshine Act's minutes requirements is equally flawed. 12 C.F.R. § 281.1. The Act mandates that closed meetings maintain "a complete transcript or electronic recording" or detailed minutes, with non-exempt portions "promptly available to the public." 5 U.S.C. § 552b(f)(1)-(2). The FOMC's delayed, curated summaries fall far short of this standard, omitting real-time insights while withholding full transcripts for *five years*, depriving the public of meaningful access to deliberations that shape the economy.

71.     The FOMC's categorical closures, justified by its legally unsupported policy statement, contravene the Sunshine Act's mandate of openness. By operating beyond public scrutiny, the FOMC is deliberately undermining the public accountability envisioned by Congress.

*Harm to Azoria's Business Caused by the FOMC's Categorical Secrecy*

72.    Azoria is a Delaware-based investment management firm founded and led by James T. Fishback with the mission of achieving positive returns for its investors.

73.    Azoria manages the Azoria 500 Meritocracy ETF (ticker: SPXM), which invests in a subset of the top 500 U.S.-listed companies. Because the Azoria 500 Meritocracy ETF is an actively managed ETF, Azoria must continually evaluate and often adjust the allocation of capital within the fund to maximize potential return for its investors and ensure the strategy is managed in accordance with the Fund's prospectus.

74.    Azoria is in the final stages of preparing to launch its Azoria Golden Age ETF (ticker: GAGE). The Azoria Golden Age ETF will target U.S.-listed companies poised to lead in artificial intelligence, the resurgence of domestic manufacturing, and American energy independence. As an actively managed fund, Azoria will allocate capital in the Golden Age ETF based on anticipated five-year return potential. Azoria will launch the Golden Age ETF on August 5, 2025. In order to do so, Azoria must make initial decisions on how to allocate capital in the Golden Age ETF by August 1, 2025.

75.    Azoria's strategy for managing its Golden Age ETF demands precise insights into both the economic data considered by the FOMC and the FOMC's policy deliberations in order to navigate the complex interplay of interest rates, inflation expectations, and credit availability, because that information impacts the value of investments in those ETFs.

76.    Among the assets in the Golden Age ETF, Azoria intends to hold U.S. Treasury bonds, the value of which is directly impacted by the FOMC's interest rate and asset purchase decisions.

77.     The ETF industry is extremely competitive. Azoria competes with many large asset management firms and seeks to do so on the basis of its thought leadership and performance. When Azoria (or any other investment manager) launches a fund, there are no do-overs; a fund can only be launched once, and in an extremely competitive environment for attracting investor inflows, early performance is often critical to future success.

78.     Azoria's ability to maximize return on investment and effectively fulfill its fiduciary duties in connection with the 500 Meritocracy and Golden Age ETFs hinges on understanding the FOMC's opaque decision-making process, including both the underlying data considered by the FOMC and its policy deliberations, which together dictate the landscape for Azoria's investments. For example, companies building AI data centers require low borrowing costs to fuel expansion, manufacturers weighing a return to U.S. shores depend on stable currency values and economic conditions, and energy firms need predictable credit markets to drive innovation—all factors directly influenced by FOMC policies on interest rates and asset purchases, and all factors which impact the value of holdings in Azoria's 500 Meritocracy and Golden Age ETFs.

79.     Operating in this Fed-driven market, Azoria's ability to maximize long-term value for its investors rests on the transparency the Sunshine Act promises. Without real-time access to the FOMC's discussions, Azoria is forced to anticipate policy shifts with incomplete information, specifically, vague speeches and sanitized minutes released weeks after the FOMC's meetings. This situation, rooted in the FOMC's improper refusal to comply with the Sunshine Act's mandates, places Azoria at the mercy of a system designed to obscure rather than illuminate the forces shaping America's economy and Azoria's investments.

80.    The FOMC's categorical closure of its meetings, in defiance of the Sunshine Act's mandate for transparency, casts a long shadow over America's economic and democratic landscape. By shrouding its deliberations on monetary policy—decisions that dictate interest rates, credit availability, and economic stability—the FOMC denies American workers and retirees, small and large businesses, and investors of all sizes (including Azoria) the statutory right to observe and engage with the public business it is charged with carrying out, sowing uncertainty and eroding trust in the U.S. financial system.

81.    Azoria is deeply concerned that the FOMC, under Chair Jerome Powell, is maintaining high interest rates to undermine President Donald J. Trump and his economic agenda, to the detriment of American citizens and the American economy. If the FOMC's July 29–30, 2025, meeting proceeds in secret, it will unlawfully deprive Azoria and the American public of timely access to deliberations that may reveal improper political motives behind the FOMC's decisions.

82.    Azoria's concerns about improper political motives within the FOMC are well-founded in the public record, including statements from former FOMC officials. For example, in August of 2019, Dr. William Dudley, former Vice-Chairman of the FOMC, wrote in a Bloomberg opinion article that "[t]here's even an argument that the election itself falls within the Fed's purview. After all, Trump's reelection arguably presents a threat to the U.S. and global economy, to the Fed's independence and its ability to achieve its employment and inflation objectives. If the goal of monetary policy is to achieve the best long-term economic outcome, then Fed officials should consider how their decisions will affect the political outcome in 2020." This statement from the former FOMC vice-chairman suggests that the FOMC very well may make interest rate decisions with political goals in mind—in this example, using the Federal Reserve's interest rate

policy to hurt President Donald J. Trump's electoral chances in the 2020 U.S. presidential election.[2]

83.     Moreover, Azoria believes the current policy stance of the FOMC appears politically motivated. The FOMC, led by Powell, chose to cut the federal funds rate by fifty basis points (0.50%) in September 2024, immediately prior to the 2024 U.S. presidential election—which represented the FOMC's largest rate cut in over 4 years. Since President Trump took office, however, the Powell-led FOMC has chosen to not lower interest rates at each of the four FOMC meetings this year even though inflation is lower today than it was in September 2024 when the FOMC cut rates by the largest amount in over 4 years. Azoria believes that the FOMC's sudden about-face—from aggressively lowering rates before the 2024 election despite elevated inflation, to then refusing to lower rates under President Trump's tenure despite clear and sustained disinflation—raises serious questions about whether politics, not economics, are driving monetary policy. These questions emphasize the need for transparency from the FOMC.

84.     The FOMC's secrecy breeds volatility and uncertainty for investment firms like Azoria. Without access to meeting notices, agendas, or real-time deliberations, Azoria must rely on incomplete signals—vague public speeches from FOMC members or heavily-edited meeting "minutes" that do not include direct quotes released three weeks after meetings—to predict policy shifts that affect interest rates, inflation, and the direction of the U.S. economy. This secrecy increases the risk of capital misallocation and portfolio losses.

85.     Operationally, the FOMC's closed-door practices frustrate Azoria's efforts to fulfill its fiduciary obligations. As an investment manager, Azoria is duty-bound to act in its investors'

---

[2] *See* Bill Dudley, *The Fed Shouldn't Enable Donald Trump*, Bloomberg (Aug. 27, 2019), https://www.bloomberg.com/opinion/articles/2019-08-27/the-fed-shouldn-t-enable-donald-trump?srnd=opinion.

best interests, requiring timely data to adjust strategies in response to monetary policy changes. The FOMC's refusal to provide meeting access or prompt records of its deliberations forces Azoria to operate in a fog of ambiguity, undermining both Azoria's role as a fiduciary and investor confidence generally.

86.     While this harm impacts Azoria in the individualized ways set forth herein, it also extends far beyond Azoria, touching millions of Americans who bear the weight of the FOMC's intentional secrecy. American families seeking mortgages face unpredictable borrowing costs and small businesses reliant on credit struggle with tightened margins—both without the opportunity to observe or influence the deliberations driving these outcomes. The Sunshine Act's promise of public access to agency meetings ensures that such critical decisions are made in the open, yet the FOMC's illegal closures deny this right. 5 U.S.C. § 552b(b).

87.     This secrecy undermines the democratic accountability at the heart of the Sunshine Act, a statute created with the express purpose of restoring public faith in the federal government. By barring access to its meetings, the FOMC actively thwarts that purpose, leaving businesses and citizens to fend for themselves in a world shaped by the FOMC's secrecy. Azoria joins a number of media organizations in the belief that "Democracy Dies in Darkness."

***The FOMC's Impending July 29–30, 2025 Closed Door Meeting***

88.     The FOMC's meeting scheduled for July 29–30, 2025 represent a critical juncture for Azoria and the American public, as the FOMC's persistent refusal to comply with the Sunshine Act will cause immediate and irreparable harm to Azoria. Consistent with its historical practice, the FOMC under the leadership of Chair Jerome Powell will hold this meeting closed to the public, withholding notices, agendas, and real-time deliberations in violation of the Act

89.     For Azoria, the July 29–30 meeting is pivotal, as the FOMC's review of economic data, deliberations concerning monetary policy, and decision on the level of interest rates will directly shape the investment landscape for its 500 Meritocracy and Golden Age ETF investment strategies. On the eve of its Azoria's Golden Age ETF going public on U.S. exchanges, access to the FOMC's meeting notices, agendas, and live deliberations, as guaranteed by Sunshine Act, is uniquely critical to set initial investment allocations (for Golden Age), manage existing investment allocations (for 500 Meritocracy), assure investor confidence, and mitigate risks. Without this transparency, Azoria faces imminent harm, forced to rely on delayed and heavily curated minutes or vague public statements that intentionally obscure critical signals needed to establish the ETF's foundational strategy.

90.     The broader public faces equally urgent consequences from the FOMC's closed-door deliberations. The July 29–30 meeting will influence borrowing costs for homebuyers seeking mortgages, small businesses relying on credit, and retirees planning for the future—decisions that ripple across every corner of America. By denying access to these proceedings, the FOMC violates the Sunshine Act's promise of transparency, leaving citizens and businesses like Azoria to navigate a policy landscape shaped in secret. Immediate judicial intervention is essential to compel the FOMC to comply with 5 U.S.C. § 552b before July 29, 2025, ensuring that Azoria and the public can access the meetings' notices, agendas, and deliberations to mitigate the irreparable economic and democratic harms that the FOMC's continued secrecy will inflict.

### FIRST CAUSE OF ACTION
### Violation of the Government in the Sunshine Act (5 U.S.C. § 552b)

91.     Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

92. The Government in the Sunshine Act, 5 U.S.C. § 552b(b), mandates that "every portion of every meeting of an agency shall be open to public observation" unless a specific exemption applies.

93. Section 552b(e)(1) further requires agencies to publish meeting notices, including time, place, and subject matter, in the Federal Register at least seven days in advance.

94. The FOMC is an "agency" or "subdivision" subject to the Sunshine Act. 5 U.S.C. § 552b(a)(1).

95. The FOMC's regular meetings, including its July 29–30, 2025 meeting, are "meetings" under the Sunshine Act's definition. 5 U.S.C. § 552b(a)(2).

96. The FOMC has categorically closed its meetings, including the July 29–30, 2025 meeting without properly invoking an exception. This violates 5 U.S.C. § 552b.

97. The FOMC's actions denying public access to its deliberations on monetary policy—decisions that shape interest rates, credit availability, and economic stability—deny Azoria and the public at large their statutory right to observe and engage with these proceedings.

98. As a result of the FOMC's actions, Azoria suffers a concrete injury because it is denied the meeting notices, agendas, and FOMC meeting deliberations critical to its optimal management of the Golden Age ETF and 500 Meritocracy.

99. The FOMC's secrecy forces Azoria to navigate a labyrinth of ambiguity, relying on vague public statements or delayed minutes to anticipate economic and policy shifts that affect its investments. This secrecy directly undermines Azoria's ability to fulfill its fiduciary duties.

100. Pursuant to 5 U.S.C. § 552b(h)(1), Azoria seeks a declaratory judgment that the FOMC's categorical closure of its meetings violates the Sunshine Act.

101.    Azoria further seeks a temporary restraining order compelling the FOMC to open its July 29–30, meeting to public observation and to publish notices and agendas in compliance with § 552b(e)(1); and preliminary and permanent injunctions against the FOMC's continued practice of closing its meetings to the public as described in 12 C.F.R. § 281.1.

<u>SECOND CAUSE OF ACTION</u>
**Violation of the Administrative Procedure Act (5 U.S.C. § 706)**

102.    Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

103.    The Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and (D) empower this Court to set aside agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations;" or attempted "without observance of procedure required by law."

104.     The FOMC's secrecy policy, articulated in 12 C.F.R. § 281.1, which bars public access to all meetings under a blanket invocation of Exemption 9, 5 U.S.C. § 552b(c)(9), is a final agency action subject to judicial review under § 706.

105.    The FOMC's secrecy policy is arbitrary, capricious, and inconsistent with the law. By reflexively claiming non-applicability of the Sunshine Act, or in the alternative invoking Exemption 9(A) of the Act for every portion of every meeting, the FOMC fails to demonstrate that premature disclosure would lead to significant financial speculation, as required by § 552b(c)(9). This blanket approach ignores the Act's mandate for openness. The FOMC's policy exceeds its statutory authority under § 552b, as it nullifies the Act's presumption of public access without reasoned justification.

106.    As a result of the FOMC's unlawful policy, Azoria suffers ongoing harm, denied the real-time information needed to manage its Golden Age ETF and 500 Meritocracy ETF in a

market driven by the FOMC's decisions. The public, too, is deprived of its right to observe the FOMC's policymaking, facing the consequences of secret decisions that affect borrowing costs, business viability, and purchasing power.

107.    Pursuant to 5 U.S.C. § 706(2)(A), (C), and (D), Plaintiff seeks a declaratory judgment that the FOMC's secrecy policy, 12 C.F.R. § 281.1, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;" and/or "without observance of procedure required by law." 5 U.S.C. § 706(1), (2)(A), (C), (D). Plaintiff further seeks a temporary restraining order and preliminary and permanent injunctive relief to enjoin Defendants from enforcing the FOMC's secrecy policy and compelling compliance with § 552b for the July 29–30, 2025, meeting and beyond.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Azoria Capital, Inc., respectfully requests that this Court grant the following relief:

a.  **Declaratory Judgment**: A declaratory judgment: (i) that the FOMC is subject to the Sunshine Act, 5 U.S.C. § 552b; (ii) that FOMC's secrecy policy memorialized in 12 C.F.R. § 281.1 and the closure of its July 29-30 meeting to the public violate the Sunshine Act and the APA; and, (iii) declaring invalid and setting aside 12 C.F.R. § 281.1 and the closure of the FOMC's July 29-30 meeting under 5 U.S.C. § 706(2)(A), (C), and/or (D).

b.  **Temporary Restraining Order**: A temporary restraining order pursuant to 5 U.S.C. § 552b(h)(1) and Fed. R. Civ. P. 65(b) enjoining Defendants from closing the FOMC's July 29–30, 2025, meeting to the public.

c. **Preliminary and Permanent Injunctions**: Preliminary and permanent injunctions pursuant to 5 U.S.C. § 552b(h)(1), and 5 U.S.C. § 701 *et seq*., and Fed. R. Civ. P. 65(a), enjoining Defendants from holding any future meeting under the FOMC's secrecy policy, 12 C.F.R. § 281.1, and directing Defendants to conduct all future FOMC meetings in accordance with the Sunshine Act's requirements, including but not limited to its requirements to (i) hold meetings open to the public, unless a specific and legitimate exemption under § 552b(c) is properly invoked and publicly explained; (ii) disclosing full transcripts or *detailed* minutes to the public "promptly" after meeting; and, (iii) establishing a new Sunshine Act policy that is consistent with the law.

d. **Attorney's Fees and Costs**: Award Azoria reasonable attorney's fees and litigation costs pursuant to 5 U.S.C. § 552b(i), 28 U.S.C. § 2412, and any other relevant provision of law.

e. **Other Relief**: Grant all other relief the Court deems just and proper.

Respectfully submitted,

Date: July 24, 2025

*/s/ Steve Roberts*

Steve Roberts
District of Columbia Bar No. 989338
Anne Marie Mackin*
Texas State Bar No. 24078898
Jesse Vazquez
District of Columbia Bar No. 1657600
Lex Politica PLLC
#129 7415 SW Parkway
Building 6, Suite 500
Austin, TX 78735
Telephone: (512) 354-1785
steve@lexpolitica.com
amackin@lexpolitica.com
jvazquez@lexpolitica.com

**ATTORNEYS FOR PLAINTIFF**

* Motion for admission *pro hac vice* forthcoming

VERIFICATION

I, James T. Fishback, declare as follows:

1. I am Founder and CEO of Azoria Capital, Inc., the Plaintiff in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*. I am a resident of the State of Florida. I am over the age of 18.

2. I have personal knowledge of Azoria Capital, Inc., its activities, and its intentions, including those set out in the foregoing *Verified Complaint for Declaratory and Injunctive Relief*, and if called to testify, I would competently testify as to those matters as they are stated herein.

3. I verify under penalty of perjury that the factual statements in the foregoing *Verified Complaint for Declaratory and Injunctive Relief* concerning Azoria Capital, Inc., its activities, and its intentions, are true and correct. 28 U.S.C. § 1746.

Executed on this ___24___ day of July, 2025.

James Fishback