**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

———————————————————————

| | |
|---|---|
| AZORIA CAPITAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:25-cv-02388-BAH |
| v. | ) |
| | ) |
| JEROME H. POWELL, *in his official capacity as* | ) |
| *Chair of the Board of Governors of the* | ) |
| *Federal Reserve System and Chair of the Federal* | ) |
| *Open Market Committee, et al.,* | ) |
| | ) |
| Defendants. | ) |

———————————————————————

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER**

Plaintiff's claims are foreclosed by express statutory language and binding circuit precedent. It nonetheless brings an extraordinary eleventh-hour request seeking to restrain the conduct of a meeting of the Federal Open Market Committee that has been publicly scheduled *for nearly a year* in accordance with an important and lawful policy that Plaintiff concedes has been in place *for nearly fifty years*. And it does so for its own purposes contrary to the public interest. No temporary restraining order ("TRO") factor supports Plaintiff's baseless motion, and it should be denied.

## BACKGROUND

This suit concerns whether the Federal Open Market Committee ("FOMC") and its meetings are subject to the Government in the Sunshine Act of 1976, 5 U.S.C. § 552b ("Sunshine Act"), and its requirement that certain governmental bodies conduct certain meetings or portions thereof in public.

By way of history, the Federal Reserve System, the nation's central bank, was first established in 1913 by the Federal Reserve Act, 12 U.S.C. § 221 *et seq.* ("FRA").  It consists of the Board of Governors of the Federal Reserve System ("Board"), twelve regional Federal Reserve Banks, and the FOMC.  *See The Federal Reserve System, The Fed Explained: What the Central Bank Does* 7–8, (11th ed. 2021) ("*The Fed Explained*").  The Federal Reserve *System* is thus not a single entity, but rather a number of legally distinct entities, *Reuss v. Balles*, 584 F.2d 461, 462 (D.C. Cir. 1978) ("The Federal Reserve System . . . is not a single entity, but rather a composite of several parts, both public and private.").  These distinct legal entities include: 1) the Board, which is a federal government agency composed of seven members, *see* 12 U.S.C. § 241; 2) the twelve individual Reserve Banks, which are "corporations whose stock is owned by the member commercial banks within their districts," *Comm. for Monetary Reform v. Bd. of Governors of Fed. Rsrv. Sys.*, 766 F.2d 538, 540 (D.C. Cir. 1985) (citing 12 U.S.C. § 321); and 3) the FOMC, which is a separate entity comprised of the seven members of the Board and five representatives of the Reserve Banks.  12 U.S.C. § 263; *Reuss*, 584 F.2d at 462.

"Among the principal functions of the Federal Reserve System is the conduct of monetary policy, the aim of which is to promote national economic goals through influence on the availability and cost of bank reserves, bank credit and money."  *Comm. for Monetary Reform*, 766 F.2d at 539.  There are three primary means through which the Federal Reserve System implements monetary policy—open market operations (purchases and sales of certain securities in the open market), 12 U.S.C. §§ 263(b), 355, over which the FOMC has exclusive control by statute, *FOMC v. Merrill*, 443 U.S. 340, 344 (1978) (citing 12 U.S.C. § 263); establishment by the Reserve Banks, subject to review and determination by the Board, of discount rates at which depository institutions and member banks can borrow from Reserve

2

Banks, 12 U.S.C. §§ 347b(a), 357; and establishment by the Board of reserve requirements, as well as the interest rate that the Reserve Banks' accountholders may earn on their deposits, 12 U.S.C. § 461(b)(2)(A) and (b)(12).  *See Melcher v. FOMC*, 644 F. Supp. 510, 518 (D.D.C. 1986), *aff'd*, 836 F.2d 561 (D.C. Cir. 1987).  "The FOMC is charged with conducting open market operations 'with a view to accommodating commerce and business and with regard to their bearing upon the general credit situation of the country.'"  *Merrill*, 443 U.S. at 344 (quoting 12 U.S.C. § 263(c)).

For nearly a half century, since shortly after enactment of the Sunshine Act, the FOMC has taken the position that the Sunshine Act does not apply to it.  *See* Implementation of the Amendment to the Freedom of Information Act Required by the Government in the Sunshine Act, 42 Fed. Reg. 13,299 (Mar. 10, 1977) (formerly codified at 12 C.F.R. § 281.2 (1977)) (currently codified at 12 C.F.R. § 281.1 (2024)).  Specifically, the FOMC has noted that its constituents are not directly appointed to their role *qua* FOMC members but instead serve on an ex officio basis, *id.*, whereas the Sunshine Act states that it applies to any "body composed of two or more individual members, a majority of whom are *appointed to such position* by the President with the advice and consent of the Senate."  5 U.S.C. § 552(b)(1) (emphasis added).  Four years later, when the D.C. Circuit first held that ex officio members of a board were to be disregarded in determining the applicability of the Sunshine Act, the court specifically referenced the FOMC's policy and noted that the FOMC's construction of the Act was "consistent" with its holding.  *See Symons v. Chrysler Corp. Loan Guar. Bd.*, 670 F.2d 238, 243 (D.C. Cir. 1981).

In testimony before Congress, then-Board Chair Alan Greenspan described some of the problems that would result if the contents of FOMC meetings were not subject to disclosure

restrictions.  He explained that the type of free-ranging exchange of views necessary for effective monetary policy, if made public, could "creat[e] unnecessary volatility in financial and foreign exchange markets," could "prove unsettling to markets," and could "ignit[e] a speculative reaction when the discussion was disclosed."  Alan Greenspan, *Testimony before the Committee on Banking, Finance and Urban Affairs, U.S. House of Representatives*, H.2. 28 Federal Reserve System Accountability Act (Oct. 19, 1993), 1993 WL 747977.  Subsequently, the FOMC formally adopted a practice of releasing transcripts of its meetings after a delay of five years, *see Federal Reserve Bulletin* (Mar. 1995) at 265, *available at* https:// ypfsresourcelibrary.blob.core.windows.net/fcic/YPFS/Federal-Reserve-Bulletin-March-1995.pdf, a period that Mr. Greenspan felt was sufficiently long to not impact ongoing business cycles.  *See Transcript of Meeting of the FOMC* at 39 (Nov. 16, 1993), *available at* https://www.federalreserve.gov/monetarypolicy/files/FOMC19931116meeting.pdf (statement of Mr. Greenspan).

Plaintiff seeks to enjoin this policy and thereby force the FOMC to conduct its meeting scheduled for July 29 and July 30 in public.  Although this meeting was announced almost a year ago on August 9, 2024, *see* Press Release, Board of Governors of the Federal Reserve System, *Federal Open Market Committee announces its tentative meeting schedule for 2025 and 2026* (Aug. 9, 2024), *available at* https://www.federalreserve.gov/newsevents/pressreleases/ monetary20240809a.htm, Plaintiff did not file suit and seek provisional relief until July 24, 2025, nearly a year later, and less than a week before the meeting.  Plaintiff asserts that the Sunshine Act applies to the FOMC and requires it to conduct its meetings in public.  TRO Br. at 1. Plaintiff contends that because it lacks "access to the FOMC's real-time thinking," it "cannot properly invest," *id.* at 8.  It seeks an order compelling the FOMC to refrain from "conducting

4

any meeting that is closed to the public, including the meeting scheduled for July 29–30, 2025"

and "enforcing, administering, complying with, or relying upon 12 C.F.R. § 281.1."  TRO

Proposed Order.

## STANDARD OF REVIEW

"The standard for issuance of the 'extraordinary and drastic remedy' of a temporary

restraining order or preliminary injunction is by now well-established."  *Aviles-Wynkoop v. Neal*,

978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Munaf v. Geren*, 553 U.S. 674, 689 (2008)).  "To

prevail, the moving party must demonstrate:  (1) a substantial likelihood of success on the merits;

(2) that the moving party would suffer irreparable injury if the injunction were not granted;

(3) that an injunction would not substantially injure other interested parties; and (4) that the

public interest would be furthered by the injunction."  *Id.*  The substantive standard for a

temporary restraining order is the same as for the issuance of a preliminary injunction.  *See*

*Sterling Com. Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13

(D.D.C. 2011) (explaining that the difference between the two procedural requests is that the

former may be granted without notice whereas the latter may not).

Even when irreparable harm—the second factor—is demonstrated, it "may be insufficient

on its own to warrant a preliminary injunction."  *Hanson v. D.C.*, 120 F.4th 223, 243 (D.C. Cir.

2024).  The third and fourth factors merge when the Government is the opposing party.  *See*

*Nken v. Holder*, 556 U.S. 418, 435 (2009).  And the purpose of a preliminary injunction is

"merely to preserve the relative positions of the parties until a trial on the merits can be held."

*Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (quotation omitted).  Consequently,

"courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the

status quo . . . .'"  *Hanson*, 120 F.4th at 247.

**ARGUMENT**

The Court should deny Plaintiff's motion. Binding circuit precedent and clear statutory language make it highly unlikely that Plaintiff could succeed on the merits. And the remaining equitable factors likewise weigh against granting preliminary relief: Plaintiff has put forth no evidence that it faces any great harm, it would not have access to the requested information even if the FOMC's policy were invalidated, and its inexcusable delay in seeking relief undermines its claim of irreparable harm. It also would not be in the public interest to grant Plaintiff's request to further its pecuniary interests at the expense of the FOMC's ability to fulfill its statutory mandate and protect the Nation's economy, and its attempt to reverse an administrative practice dating nearly half a century to the Sunshine Act's adoption seeks to alter, rather than preserve, the status quo.

**I.    Plaintiff Is Unlikely to Succeed on the Merits**

Plaintiff is unlikely to succeed on the merits of its claim that the FOMC is subject to the Sunshine Act because its assertions are precluded by binding Circuit and Supreme Court precedent. The D.C. Circuit has expressly endorsed the FOMC's position that it is not an agency subject to the Sunshine Act because its members are not directly appointed to the FOMC, but instead serve on the FOMC ex officio. *Symons.*, 670 F.2d at 243 (crediting "previous consistent constructions of the Act," including that "[t]he Federal Open Market Committee (FOMC) has concluded that it is not a covered agency" in light of ex officio membership). Nor is the FOMC subject to the Sunshine Act as a purported subdivision of the Board exercising authority "on behalf of" the Board, as Plaintiff mistakenly contends, *see* TRO Br. at 14 (citing 5 U.S.C. § 552b(a)), because the FOMC is indisputably not part of the Board and because it exercises its own statutory duties rather than exercising delegated duties on behalf of the Board. *See* 12

U.S.C. § 263; 12 C.F.R. § 281.1 (the FOMC "is a separate and independent statutory body within the Federal Reserve System," and "[i]n no respect is it an agent or 'subdivision'" of the Board"). Plaintiff therefore cannot show a likelihood of success on its Sunshine Act claim or on its duplicative APA claim.  *See Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 683 (D.C. Cir. 2023) (APA does not provide a cause of action for a claim that merely overlaps with a Sunshine Act claim).[1]

### A.    The FOMC Is Not an Agency for Purposes of the Sunshine Act

The Sunshine Act only applies to agencies "headed by a collegial body composed of two or more individual members, a majority of whom are *appointed to such position* by the President with the advice and consent of the Senate." 5 U.S.C. § 552b(a)(1) (emphasis added).  The D.C. Circuit has repeatedly held that "appointed to such position" refers to direct appointment to serve on the body in question rather than appointment to another role that also serves on the body in an ex officio capacity.  *See Ctr. for Biological Diversity v. U.S. Int'l Dev. Fin. Corp.*, 77 F.4th 679, 688 (D.C. Cir. 2023) (citing 5 U.S.C. § 552b(a)(1) and *Symons*, 670 F.2d at 241) ("'[A]ppointed to such position' in the Sunshine Act requires that the majority of an agency's Board members be appointed to the Board itself, *not serve ex officio*." (emphasis added)).  Indeed, as noted above, when the D.C. Circuit first adopted this construction of the Sunshine Act's "unambiguous" language as disregarding ex officio service, *Symons*, 670 F.2d at 242, it specifically noted that the FOMC's "previous consistent construction[] of the Act" that Plaintiff now challenges

---

[1] Given the straightforward and controlling precedent foreclosing the TRO Plaintiff seeks, the FOMC does not address Plaintiff's standing contentions here but reserves its right to do so once it has been properly served with a summons and complaint in this matter.

accorded with "the reading given to the statute" in its ruling. *Id.* at 243 (citing 12 C.F.R. § 281.2 (1981)[2]).

Pursuant to this controlling precedent, *no* official serving on the FOMC "is appointed to such position" and the FOMC is not subject to the Sunshine Act. The FRA does not provide for direct "appoint[ment] to" the FOMC as the phrase is used in the Sunshine Act. Instead, FRA provisions that make no mention of the FOMC provide for members of the *Board* to be appointed *qua Board members* by the President with the advice and consent of the Senate, *see* 12 U.S.C. § 241, and for certain Reserve Bank directors to appoint the Bank's presidents and vice presidents subject to the Board's approval. *Id.* § 341(fifth). In a *separate provision* making no reference to appointment, the FRA provides that the FOMC "*shall consist of* the members of the Board of Governors of the Federal Reserve System and five representatives of the Federal Reserve banks [who] shall be presidents or first vice presidents of Federal Reserve banks." 12 U.S.C. § 263 (emphasis added). Thus, none of these officials are "appointed to" the FOMC; they are appointed to other offices and serve on the FOMC ex officio. It is precisely such organic acts providing for a governmental body that "shall consist of" officers appointed to *other positions* serving in an ex officio role that the D.C. Circuit has construed as creating entities not subject to the Sunshine Act. *See Ctr. for Biological Diversity*, 77 F.4th at 687–88 (construing 22 U.S.C. § 9613(b)(2)(B)(i)); *Symons*, 670 F.2d at 240–41 (construing 15 U.S.C. § 1862 (Supp. III 1979)).

Plaintiff's attempt to distinguish *Symons* on the grounds that, "[i]n *Symons*, board membership was not automatic but rather ex officio and discretionary," is simply wrong. First, *Symons* itself noted that the FOMC's position that it is not subject to the Sunshine Act was

---

[2] 12 C.F.R. § 281.2 has been redesignated at 12 C.F.R. § 281.1.

"consistent" with its holding. *Symons*, 670 F.2d at 243. Moreover, like the FOMC's organic act, the statute at issue in *Symons* provided for a governmental body that "shall consist of" the specified officials, making their participation in no way "discretionary" and no more "ex officio" than the participation of the Board's Governors on the FOMC. *Compare* 15 U.S.C. § 1862 (Supp. III 1979) *with* 12 U.S.C. § 263(a). Therefore, under binding circuit precedent, the FOMC is not an agency subject to the Sunshine Act.

**B.    The FOMC Is Not Subject to the Sunshine Act as a "Subdivision" of the Board**

Plaintiff alternatively argues that the FOMC is a "subdivision" of the Board (which is subject to the Sunshine Act), and that since the Sunshine Act applies to a "subdivision . . . authorized to act on behalf of" an agency subject to the Act, it must therefore apply to the FOMC. But the FOMC is not a subdivision of the Board, nor does it act on the Board's behalf.

The FOMC is not a "subdivision" of the Board because it is not *part* of the Board. *See Reuss*, 584 F.2d at 462 ("The Federal Reserve System . . . is not a single entity, but rather a composite of several parts, both public and private [including] a seven-member Board of Governors, twelve regional Federal Reserve Banks, [and] the Federal Open Market Committee (FOMC)."); *see also Riegle v. FOMC*, 656 F.2d 873, 876 (D.C. Cir. 1981), *disapproved on other grounds by Melcher v. FOMC*, 836 F.2d 561 (D.C. Cir. 1987) (describing the Board as "public" while explaining that "[t]he FOMC . . . is constituted to reflect both public *and* private interests" (emphasis added)); *The Fed Explained* at 21 ("[c]onducting monetary policy effectively involves . . . *two* decisionmaking bodies—the Board of Governors (Board) and the Federal Open Market Committee" (emphasis added)).

A subdivision, by contrast, is "something produced by subdividing such as: a subordinate part of a larger whole." *Merriam-Webster Online Dictionary*, https://www.merriam-

webster.com/dictionary/subdivision.  Thus, a subdivision of an agency would be entirely

contained within the agency, as the Supreme Court recognized when it explained that "[t]he term

'subdivision' itself indicates *agency members* who have been authorized to exercise formally

delegated authority."  *FCC v. ITT World Commc'ns, Inc.*, 466 U.S. 463, 472 (1984) (emphasis

added).  If the FOMC consisted solely of a subset of Board members, it might therefore be a

subdivision of the Board; but instead, it not only includes all Board members, but also includes

officers of Reserve Banks, which are not "part of" the Board and are in fact established in wholly

separate subchapters of the FRA.  *Compare* 12 U.S.C. ch. 3 subch. II (establishing the Board)

*with id.* ch. 3 subchs.VI–VII, IX (establishing the Reserve Banks).[3]  The FOMC is therefore in

no way a "subdivision" of the Board.

      Nor is the FOMC "authorized to act on behalf of the" Board, which is a necessary

precondition for a subdivision to be subject to the Sunshine Act.  *See* 5 U.S.C. § 552b(a).  As the

Supreme Court explained, this condition makes the Sunshine Act applicable "only where a

subdivision of the agency deliberates upon matters that are within that subdivision's formally

*delegated authority to take official action for the agency*."  *ITT*, 466 U.S. at 472. (emphasis

---

[3] Each Reserve Bank is a separate corporation with its own board of directors that appoints
officers to run the Bank's day-to-day operations.  *See* 12 U.S.C. § 341 (Reserve Banks are "a
body corporate").  Reserve Banks can make contracts, adopt bylaws, and sue and be sued.  *Id.*
§ 341 (enumerating powers of Federal Reserve Banks).  The courts have repeatedly made clear
that Reserve Banks are instrumentalities separate from federal agencies, including the Board.
*See, e.g.*, *U.S. Shipping Bd. Emergency Fleet Corp. v. W. Union Tel. Co.*, 275 U.S. 415, 425-26
(1928) ("Instrumentalities like . . . the federal reserve banks, in which there are private interests,
are not departments of the Government.  They are private corporations in which the Government
has an interest."); *Scott v. Fed. Reserve Bank of Kan. City*, 406 F.3d 532, 535 (8th Cir. 2005) ("it
is possible to be a fiscal agent or instrumentality of the government without being a federal
agency"); *see also Melcher v. FOMC*, 644 F. Supp. 510, 521 (D.D.C. 1986), *aff'd*, 836 F.2d 561
(D.C. Cir. 1987) ("Ever since the birth of this nation, the regulation of the nation's monetary
systems has been governed by a subtle and conscious balance of public and private elements.").

added).  But when the FOMC acts, it is not exercising "delegated authority to take official action for" the Board, but is instead exercising authority that the FRA directly assigns to it.  In fact, the FRA's delegation provision does not provide for the Board to delegate its own duties to the FOMC.  *See* 12 U.S.C. § 248(k).  It is the FOMC, and *not the Board*, that is directly charged by Congress with regulating and directing Reserve Banks' open market activities.  12 U.S.C. § 263(b); *Comm. for Monetary Reform*, 766 F.2d at 539 ("In addition to the FOMC, the [Federal Reserve] System includes the Board of Governors, [but] open market trading. . . is exclusively the function of the FOMC.").[4]  Tellingly, Plaintiff identifies no duty assigned *to the Board* that the Board has chosen to delegate to the FOMC to perform "on behalf of" the Board.  The FOMC is therefore not a "subdivision" of the Board acting "on behalf of" the Board so as to be subject to the Sunshine Act.

## II.    The Remaining Equitable Factors Weigh Against Granting Preliminary Relief

With respect to the remaining equitable factors, Plaintiff cannot show irreparable harm because (1) its assertions are speculative and conclusory in nature; (2) FOMC meetings could be closed to the public even if the Sunshine Act applied; and (3) Plaintiff engaged in nearly a year-long delay after the meeting was announced before seeking relief, undermining its assertions of urgency.  In contrast, the disclosures Plaintiff seeks could irreparably damage the nation's economy and granting such relief would not be in the public interest.  The balance of the equities

---

[4] The FRA expressly charges both the FOMC and the Board—which has authority over *other* tools of monetary policy such as reserve requirements for depository institutions, 12 U.S.C. § 461(b)(2)(B), (14)—with achieving certain monetary policy goals, with no indication that the FOMC acts as the Board's agent in this regard.  *Id.* § 225a.  "It is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant."  *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).  Thus, interpreting the FOMC as a subdivision of the Board would render the reference to the FOMC in section 225a wholly superfluous, a violation of statutory construction rules that courts consistently meet with disapproval.

therefore favors denying Plaintiff's request, not least because Plaintiff seeks to disrupt, rather than maintain, the status quo.

### A.    Plaintiff Cannot Show Irreparable Harm

Plaintiff, which contends that it suffers injury from lack of "access to the FOMC's real-time thinking," and that it consequently "cannot properly invest," TRO Br. at 8, fails to demonstrate irreparable harm. Such conclusory assertions of harm are insufficient to support its motion for preliminary relief. Moreover, Plaintiff is not injured by the FOMC's policy that it need not comply with the Sunshine Act because, even if the Sunshine Act were to apply to the FOMC, it would not require the FOMC to give the public access to the "FOMC's real-time thinking." And under D.C. Circuit precedent, Plaintiff's failure to seek relief for nearly a year after the meeting at issue was announced further undercuts any claim of irreparable harm.

Plaintiff's conclusory assertions of harm are insufficient to demonstrate the type of irreparable injury that can support preliminary relief. The D.C. Circuit "has set a high standard for irreparable injury. . . . [T]he injury 'must be both certain and great; it must be actual and not theoretical.'"). *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (quoting *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985) (per curiam)). And the movant must provide more than "unsubstantiated and conclusory" assertions. *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017). But here, Plaintiff makes just the sort of conclusory and speculative assertions that fail to prove that the harm it alleges is both certain and great. Plaintiff's assertion that it "cannot properly invest" because it cannot effectively forecast future economic trends without knowledge of FOMC members' exact real-time thinking, and the information they consider in reaching their decisions, is not only conclusory, but is belied by the fact that an active investment management industry has been able to ably sustain itself

throughout the 90 years that the FOMC has existed, calling into substantial doubt what "great" harm Plaintiff is suffering.  Moreover, although Plaintiff has alleged that it is part of an "extremely competitive" industry, Compl. ¶ 77, it has not produced any specific evidence showing that making the FOMC's information contemporaneously available to the world at large will somehow give *it* an advantage that would not be offset by its competitors having access to the same information.

Moreover, Plaintiff cannot show that it is harmed by the FOMC's policy of not following Sunshine Act protocols because, even if the Sunshine Act applied, it would not require disclosure of the information Plaintiff seeks.  Indeed, the Act expressly permits bodies that oversee "currencies, securities, commodities, or financial institutions" to keep confidential meetings or portions of meetings if disclosure could, *inter alia*, "lead to significant financial speculation in currencies, securities, or commodities." 5 U.S.C. § 552b(c)(9)(a)(i).[5]  Premature disclosure of FOMC discussions would do precisely that, as explained in Mr. Greenspan's testimony, *see supra* at 4, and as reflected by Plaintiff's own assertions that it desires this information in order to make investment decisions based on FOMC members' "real-time thinking.".  TRO Br. at 8.

Plaintiff's assertion that "[d]iscussions of general economic outlooks, procedural matters, or non-market-sensitive policies—routinely addressed in open meetings by agencies like the Securities and Exchange Commission—do not meet Exemption 9(A)'s narrow criteria," *id.* at 16–17, misses the mark.  Agencies like the Securities and Exchange Commission are not charged with directly modifying macroeconomic conditions as is the FOMC, so understanding

---

[5] *See also* 12 C.F.R. § 281.1 ("The FOMC has reviewed the agenda of its monthly meetings for the past three years and has determined that all such meetings could have been closed pursuant to the exemption dealing with financial speculation or other exemptions set forth in the Sunshine Act.").

their "real-time thinking" about "general economic outlooks" would be unlikely to lead to speculation in the same way or on the same dramatic scale that understanding macroeconomic policymakers' "real time thinking" would.[6]  And, with respect to "procedural matters or non-market-sensitive policies," Plaintiff has not explained what those would be.  In any event, this assertion fails to establish irreparable harm—if knowing this information would significantly affect investors' actions, it falls within the scope of the exemption, and, if it would not, then Plaintiff presumably is not suffering any "great" harm from not having access to it.

Lastly, Plaintiff, which was formed in 2023 and announced the launch of one of the funds referenced in its motion more than half a year ago,[7] waited nearly a year after the meeting at issue was announced to seek preliminary relief against a policy that has been in place for nearly 50 years.  Such "unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."  *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) (citing cases); *see also Hanson*, 120 F.4th at 245–46 ("Hanson's unhurried litigation tactics counsel against a finding of irreparable harm here."); *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1097 (N.D. Cal. 2012)

---

[6] Moreover, even if this information is "general" in nature as Plaintiff contends (whatever that means), the very fact that it is being considered by decisionmakers as part of their policy deliberations can provide the same insights into their "real-time thinking" that Plaintiff has expressly indicated would allow it to engage in speculation. *Cf. Mapother v. Dep't of Just.*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) ("Disclosure of [factual] summaries would have permitted inquiry into the mental processes of the Administrator by revealing what materials he considered significant in reaching a proper decision, and how he evaluated those materials." (quotation omitted)).

[7] Jessica Guynn, *This anti-"woke" investor is fighting DEI in the S&P 500. His first target: Starbucks*, USA Today (updated Dec. 6, 2024), https://www.usatoday.com/story/money/2024/12/05/anti-dei-investment-fund-trump/76767797007/; Suzanne McGee, *Startup asset manager opposing DEI-linked plans Mar-a-Largo rollout*, Reuters (updated Dec. 5, 2024) https://www.reuters.com/markets/us/startup-asset-manager-opposing-dei-linked-investing-plans-mar-a-lago-rollout-2024-12-05/.

("Parties spurred on by the threat of or actual immediate irreparable harm file for TROs as quickly as possible to head or stave it off.").  Thus, as one court noted, a delay of "over three months . . . to seek preliminary relief . . . strongly discredits Plaintiffs' claim that they are suffering irreparable harm."  *Pub. Citizen Health Rsch. Grp. v. Acosta*, 363 F. Supp. 3d 1, 22 (D.D.C. 2018) (citations omitted).  Here, Plaintiff's attempt to seek preliminary relief on the eve of a meeting announced nearly a year before even more "strongly discredits" its claim that it is "suffering irreparable harm."  Plaintiff fails to make the necessary showing of irreparable harm.

## B.    Granting Relief to Plaintiff Would Be Against the Public Interest

Plaintiff makes no secret of the fact that it seeks the requested relief to further its own pecuniary interest, while disregarding that this relief would significantly undermine the *public* interest.  As Mr. Greenspan's testimony explained, the FOMC keeps its discussions confidential because of understandable concerns about destabilizing the economy and prompting dangerous speculation by market participants.  *See supra* at 3-4.  Keeping these discussions confidential therefore helps the FOMC fulfill the mandate that Congress assigned it "to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rates." 12 U.S.C. § 225a.  Requiring disclosure of these discussions in real time in order to advance Plaintiff's pecuniary interests, and doing so before the Court has conclusively resolved the merits, would therefore be against the public interest.  *Cf. Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021) ("Plaintiffs' pecuniary interest is all the weaker when balanced against the public's interest.").

Moreover, the arguments Plaintiff makes for why relief would be in the public interest all presuppose that it will prevail on the merits.  *See*, *e.g.*, TRO Br. at 21 ("[T]here is a substantial public interest in having governmental agencies abide by the federal laws . . . .  Thus for the

same reasons that Plaintiff is likely to succeed on the merits . . . the public's interest require[s] relief."). However, as explained above, Plaintiff is unlikely to succeed on the merits. It therefore cannot demonstrate that granting it preliminary relief would be in the public interest.

### C.  Balancing of the Equities Weighs Against Granting Preliminary Relief

Plaintiff's failure to show a likelihood of success on the merits given binding contrary precedent, its failure to demonstrate "great" harm and reliance on conclusory assertions of harm, and its attempt to obtain a pecuniary gain before the Court has conclusively resolved the merits—in a manner that could undermine a congressionally-mandated policy—all weigh strongly against granting relief. Additionally, Plaintiff's decision to wait for months and then seek relief only days before the meeting at issue further militates against granting relief to address a purported emergency of Plaintiff's own making. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (45-day delay in seeking preliminary relief was "inexcusable" and "bolstered" a decision to deny relief). Lastly, "because 'a grant of preliminary relief could prove to be mistaken once the merits are finally decided,' courts must be 'institutionally wary of granting relief that disrupts, rather than preserves, the status quo, especially when that relief cannot be undone if the non-movant ultimately wins on the merits.'" *Hanson*, 120 F.4th at 247 (holding that it would be inappropriate to grant preliminary relief that would bar a governmental practice that had been followed for 15 years). Consequently, Plaintiff's attempt to belatedly request that this Court hastily prohibit a practice that has been followed for 50 years is especially underserving of judicial approbation. As in *Hanson*, Plaintiff "has not . . . shown the type of irreparable harm and favorable balancing of equities and interests that can warrant the exceptional relief of a status-quo-altering injunction handing him the same relief [it] would ordinarily obtain only after prevailing on the merits." *Id.* at 248.

16

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's motion.

Respectfully submitted,


 /s/ *Joshua P. Chadwick*
Joshua P. Chadwick
Yonatan Gelblum
Katherine Pomeroy
Federal Open Market Committee
20th Street and Constitution Avenue, N.W.
Washington, D.C. 20551
(202) 263-4835
joshua.p.chadwick@frb.gov

*Counsel for Federal Open Market Committee Defendants*[8]

---

[8] Counsel appear pursuant to the direction of the General Counsel of the Federal Open Market Committee and understand the "official capacity" naming of each individual defendant to be a suit against the Committee itself and not against its members in any other capacity. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.").